UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
                                     :
BAHER AZMY,                          :
                Plaintiff,           :        06 Civ. 15340 (JSR)
                                     :
                -v-                  :        OPINION AND ORDER
                                     :
UNITED STATES DEPARTMENT OF DEFENSE, :
                                     :
                Defendant.           :
------------------------------------ x

JED S. RAKOFF, U.S.D.J.

        This is an action under the Freedom of Information Act

("FOIA"), 5 U.S.C. § 552.  On October 27, 2006, plaintiff Baher Azmy,

a law professor at Seton Hall University, filed a request under FOIA

seeking information regarding his client, Murat Kurnaz, a Turkish

citizen and permanent resident of Germany, who was captured by the

United States in Pakistan and detained by the defendant United States

Department of Defense ("DOD"), at the United States Naval Base,

Guantanamo Bay, Cuba ("Guantanamo") from 2002 to 2006.  Specifically,

the request sought all records related to the proceedings involving

Kurnaz before the Guantanamo Combatant Status Review Tribunal

("CSRT") and the Guantanamo Administrative Review Board ("ARB")[1] "or

---

        [1] The CSRT was established in 2004 to determine whether
individuals detained at Guantanamo had been properly classified
as enemy combatants.  See Declaration of Karen L. Hecker ("Hecker
Decl.") ¶ 8.  Subsequently, the ARB process was established to
determine whether continued detention was warranted.  Id.  Unlike
the CSRT panels, the ARB panels make only non-final, non-binding
recommendations to a Designated Civilian Officer ("DCO"), who
then makes the final determination whether to release, transfer,
or continue to detain the detainee.  Hecker Decl. ¶ 10.  To
assist the ARB in making its recommendation to the DCO, and to
assist the DCO in making the final decision regarding whether to
release, transfer, or continue detaining a detainee, various
governmental entities make their own assessments and

otherwise related to the reasons for his capture, detention or release." See Declaration of Baher Azmy dated July 6, 2007 ("Azmy Decl.") ¶ 2.

After failing to obtain the requested material from the Government, Azmy commenced this lawsuit, seeking to compel disclosure of the requested materials. The parties agreed that all issues could be resolved through summary judgment practice, and the Government accordingly moved for summary judgment on May 31, 2007. The Court received extensive briefing from the parties and held oral argument on the motion on August 1, 2007. Although the parties had been able to resolve certain of their disputes, see Declaration of Sarah S. Normand dated May 31, 2007 ("Normand Decl.") ¶ 5, Azmy Decl. ¶¶ 4, 6, the Court was nonetheless obliged to conduct, over several months, an exhaustive, in camera review of the remaining hundreds of pages of Disputed Documents ("Disputed Docs."). This review precipitated a further Order, dated February 11, 2008, by which the Court requested supplemental letter briefing from the parties on three specific issues of concern. As a result of this supplemental briefing, still

---

recommendations concerning particular detainees. Id. ¶ 10a. These entities include the U.S. Army Criminal Investigation Task Force ("CITF"), DOD's Office of Detainee Affairs ("ODA"), the FBI, the CIA, the Department of State ("DOS"), and the Joint Task Force-Guantanamo ("JTF-GTMO"). Id. After being initially captured in 2002, Kurnaz underwent a CSRT review proceeding in September, 2004, which confirmed his designation as an enemy combatant. Id. ¶ 15. Subsequently, he underwent two ARB reviews: the first, in November 2005, which resulted in Kurnaz's continued detention; and the second, in June 2006, which resulted in his transfer two months later to German custody. Id.

further review of classified records was required.  With this arduous process now completed, the Court, for the reasons stated herein, now grants defendant's motion for summary judgment except in some minor respects detailed at the end of this Opinion.

The Government's grounds purporting to justify the specific withholdings on each of the disputed pages are listed in what is known as a "Vaughn index".  <u>See</u> Exhibit A to Declaration of Rear Admiral Mark H. Buzby dated May 30, 2007 ("Buzby Decl."); <u>Vaughn v. Rosen</u>, 484 F.2d 820 (D.C. Cir. 1973).  Overall, the disputed information has been withheld by the Government pursuant to FOIA exemptions 1, 2, 5, and/or 7.

FOIA was enacted to "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." <u>NLRB v. Robbins Tire & Rubber Co.</u>, 437 U.S. 214, 242 (U.S. 1978). The statute requires federal agencies to make their files generally available to the public unless the information withheld falls within one or more of nine specific exemptions.  The burden is on the agency to sustain its withholding, and the Court reviews the applicability of a particular FOIA exemption <u>de novo</u>, <u>see</u> 5 U.S.C. § 552(a)(4)(B) with doubts to be "resolved in favor of disclosure."  <u>A. Michael's Piano, Inc. v. FTC</u>, 18 F.3d 138, 143 (2d Cir. 1994).

FOIA Exemption 1, or the "national security" exemption, exempts from disclosure records that are: "(A) specifically authorized under criteria established by an Executive order to be

kept secret in the interest of national defense or foreign policy and
(B) are in fact properly classified pursuant to such Executive
order." 5 U.S.C. § 552(b)(1). The Executive Order here relevant is
Executive Order ("E.O.") 12,958, 60 Fed. Reg. 19,825 (Apr. 17, 1995),
as amended by E.O. 13,292, 68 Fed. Reg. 15,315 (Mar. 25, 2003). To
be properly classified pursuant to E.O. 12958: (1) an "original
classification" authority must classify the information; (2) the
information must be "owned by, produced by or for" or be "under the
control of" the United States Government; (3) the information must
fall within one of eight categories of protected information; (4) the
original classification authority must determine that the
unauthorized disclosure of the information "reasonably could be
expected to result in damage to the national security," including
damage to "defense against transnational terrorism," and the
classification authority must be able to "identify or describe the
damage" that could be caused. E.O. 12,958, § 1.1(a).

    Because the agencies responsible for national security "have
unique insights into what adverse affects (sic) might occur as a
result of public disclosures," courts are "required to accord
substantial weight to an agency's affidavit concerning the details of
the classified status of the disputed record." Military Audit
Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981) (internal
quotation marks omitted); see also Goldberg v. U.S. Dep't of State,
818 F.2d 71, 77 (D.C. Cir. 1987) ("[C]ourts should accord substantial
weight to an agency's affidavit concerning the details of the
classified status of the disputed record, albeit without

relinquishing their independent responsibility.")(internal quotation marks, emphasis and footnote omitted); <u>Associated Press v. U.S. Dept. of Defense ("AP III")</u>, 462 F. Supp. 2d 573, 576 (S.D.N.Y. 2006) ("[C]ourts must accord substantial deference to agency affidavits that implicate national security.") (internal quotation marks and citation omitted). However, "deference is not equivalent to acquiescence." <u>Campbell v. U.S. Dep't of Justice</u>, 164 F.3d 20, 30 (D.C. Cir. 1998). Instead, an agency invoking FOIA Exemption 1 is entitled to summary judgment when the affidavits describe "the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." <u>AP III</u>, 462 F. Supp. 2d at 576 (internal quotation marks and citations omitted).

In this case, DOD has withheld, pursuant to Exemption 1: (a) intelligence data regarding Kurnaz and his activities, as well as information about and other persons and organizations; (b) intelligence assessments and conclusions; (c) information relating to intelligence methods; (d) identification photographs of Kurnaz; and (e) intelligence codes.[2] At the time of plaintiff's FOIA request, all of this information was classified as "secret" by the Commander

---

[2] Plaintiff does not challenge the witholding of intelligence codes pursuant to FOIA exemptions 1 and 2. <u>See</u> Azmy Decl. ¶ 6.

of the Joint Task Force-Guantanamo ("JTF-GTMO"), currently Rear

Admiral Mark H. Buzby.  <u>See</u> Buzby Decl. ¶¶ 3, 10, 19, 24, 30, 34, 37.

Although most of the information here withheld by defendant

pursuant to this exemption appears on the face of the Disputed

Documents to fall within the exemption, plaintiff argues that much of

this information has already been discussed in the media.  <u>See</u>

Memorandum in Opposition to Defendant's Motion for Summary Judgment

("Pl. Mem.") at 20-21.  According to plaintiff, there can be no

national security interest in continuing to classify information

already widely known to the public.  <u>Id.</u>  Plaintiff argues that, at

least in this regard, Kurnaz's case is unique and unlikely to be

replicated with other detainees.  <u>See</u> Pl. Mem. at 24, 25-26

("Kurnaz's story and his picture . . . have been so widely publicized

that it is unlikely the release of information about him would add to

what is already known").

However, as Rear Admiral Buzby avers, releasing such

information in the context of the Disputed Documents would tend to

reveal information not only about Kurnaz himself but about other

"individuals and organizations of intelligence interest," as well as

revealing the sources of such intelligence.  Buzby Decl. ¶ 10, 11a,

12.  Revelation of this information would also indicate what the

United States does not know about these individuals and

organizations.  <u>Id.</u>, ¶ 11b. It could also reveal publicly who has

cooperated with interrogators at Guantanamo (and elsewhere) and what

information these cooperators have provided, thereby placing human

intelligence sources at risk and dissuading others from cooperating.
Id. ¶ 12, 14-16.

Even with respect to purely factual information that has
already been disclosed elsewhere, Buzby explains that:

> [W]hen factual information is contained within a document
> setting forth intelligence assessments, conclusions, or
> recommendations, the selection of and emphasis on particular
> facts reveals information about the analyst's thought
> process, the guidelines being applied to analyze the
> intelligence data, and the limits of or gaps in available
> intelligence. Accordingly, such factual information remains
> sensitive, even if the same or similar information has been
> publicly revealed in a different context.

Id. ¶ 17.

Although plaintiff argues that this case is unique, in
actuality DOD has received FOIA requests on behalf of over 150
current and former Guantanamo detainees. See Supplemental
Declaration of Karen L. Hecker dated July 27, 2007 ("Supp. Hecker
Decl.") ¶ 4. "DOD must consider the implications of each individual
FOIA release and the implications of that FOIA release on other
requests and releases. Categories of information released regarding
one detainee . . . will generally need to be released for all other
detainees where the same category of information exists or is
requested." Id. ¶ 5 (emphasis omitted).

Furthermore, plaintiff's argument that much information about
Kurnaz is already well known to the public is of limited legal
relevance to the application of FOIA Exemption 1. "[T]he application
of Exemption 1 is generally unaffected by whether the information has
entered the realm of public knowledge. A limited exception is
permitted only where the government has officially disclosed the

specific information the requester seeks." <u>Halpern v. FBI</u>, 181 F.3d 279, 294 (2d Cir. 1999). Under the exception for official disclosure, moreover, the Government only waives the right to withhold information if: (1) "the information requested [is] as specific as the information previously released"; (2) "the information requested [matches] the information previously disclosed"; and (3) "the information requested [was] already . . . made public through an official and documented disclosure." <u>Fitzgibbon v. CIA</u>, 911 F.2d 755, 765 (D.C. Cir. 1990). In this case, subject to the exceptions discussed below, plaintiff is not requesting information that has previously been "made public through an official and documented disclosure." Therefore, it may properly be withheld pursuant to Exemption 1. <u>See, e.g.</u>, <u>Wolf v. CIA</u>, 473 F.3d 370, 378 (D.C. Cir. 2007) ("the fact that information exists in some form in the public domain does not necessarily mean that official disclosure will not cause harm cognizable under a FOIA exemption").

Plaintiff's additional arguments for not applying Exemption 1 to certain more particularized intelligence data about Kurnaz and his activities are similarly unpersuasive. First, the Government, at Disputed Docs. 269-73, 282, and 284-86, is not withholding "portions of Judge Green's classified opinion . . . discussing facts about Kurnaz that have been widely reported in the media." Pl. Mem. at 22. Second, Disputed Docs. 61-64 do not actually redact intelligence information about Kurnaz. Instead, they redact names of third parties (which are unresponsive to plaintiff's request), intelligence

8

codes, and information about how intelligence information was acquired and disseminated.  Third, as to information regarding when and how Kurnaz was transferred to Guantanamo, the Government properly justifies the withholding as necessary to protect information about the "routing of planes and movement of detainees . . . in the theater of operations."  See Buzby Decl. ¶ 11c.  See also Supplemental Declaration of Rear Admiral Mark H. Buzby dated July 27, 2007 ("Supp. Buzby Decl.") ¶ 11.  Fourth, the Government's withholding of citations to various footnotes on Disputed Docs. 113-19 and 360-65 is proper because this information would reveal intelligence sources. Fifth, as to the miscellaneous blocks of text that the Government withholds at Disputed Docs. 59-60, 65, 73-74, 128-29, 151-53, 192-93, 366-69, 377 and 444, the Court has examined each and all of these redactions and finds that they are all proper under Exemption 1. Although it would be inappropriate to provide more specifics in a public opinion, suffice it to say that the security implications are evident on their face.

　　　With regard to still other parts of the disputed documents withheld pursuant to FOIA Exemption 1, the Court finds that withholding intelligence assessments and conclusions reached by analysts and other Government personnel is proper because its disclosure would reveal how intelligence analysts evaluate intelligence information, what information they find credible and what information they discredit, and how they reach their

intelligence conclusions.[3]  "Such revelations would aid persons
hostile to the United States in hiding their activities and thwarting
the government's intelligence gathering, and severely harm the United
States' ongoing efforts to gather intelligence."  Buzby Decl. ¶ 20.
Therefore, its release could reasonably be expected to cause serious
damage to national security.  Id.

    Also withheld under Exemption 1 is information reflecting
intelligence methods used by Government personnel in gathering,
analyzing and coordinating intelligence data, including techniques
and plans used in questioning detainees, information used to
coordinate intelligence gathering and analysis among DOD components
and other Government agencies, and plans for future intelligence
gathering.  The public release of such information "would be of
material assistance to those who would seek to penetrate, detect,
prevent, avoid or otherwise damage the intelligence operations of the
United States" and would allow "individuals of intelligence interest
to anticipate and immunize themselves from [these intelligence]
methods" and from techniques used in questioning detainees and other
sources of human intelligence.  Buzby Decl. ¶ 25a, 25b.  Similarly,
methods of coordinating intelligence gathering among various agencies
and plans for future intelligence gathering are properly withheld
pursuant to Exemption 1.

---

[3] Much of this information, along with information regarding
intelligence methods, is also withheld pursuant to Exemption 2,
but the Court need not reach that exemption because it finds that
the withholding pursuant to Exemption 1 is proper.

As to withholding Kurnaz's official identification photograph, the Court finds that this is proper under Exemption 1 for the same reasons explained in AP III, 462 F. Supp. 2d 573.

Lastly, as to information provided by a foreign government about Kurnaz, it is also properly withheld pursuant to Exemption 1. Information by foreign governments is provided to JTF-GTMO in confidence, with the expectation that it will not be publicly released. Official public release of such information would impair DOD's ability to obtain information from foreign governments in the future, who will be less likely to cooperate with the United States if they cannot be confident that the information they provide will remain confidential. Buzby Decl. ¶ 35. This could reasonably be expected to result in damage to national security and is therefore properly withheld. See Krikorian v. Dep't of State, 984 F.2d 461, 465 (D.D.C. 1993) (State Department properly withheld, inter alia, information communicated to it by foreign governments on a confidential basis because release would "jeopardize reciprocal confidentiality and damage national security") (internal quotation marks omitted).

The Government has also withheld certain information pursuant to FOIA exemption 2, including: (a) assessments of Kurnaz's law enforcement value and threat level; (b) information concerning interrogation methods; and (c) investigative procedures.[4] Exemption

---

[4] Because the Court has already found that information withheld pursuant to both Exemptions 1 and 2 was properly withheld under Exemption 1, that information will not be further discussed here in connection with Exemption 2.

2 permits the Government to withhold records "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). This applies to documents "used for predominantly internal purposes." Schiller v. NLRB, 964 F.2d 1205, 1207 (D.C. Cir. 1992)(internal quotation marks and citation omitted). If material meets the "predominant internality" test, "an agency may withhold the material by proving that either [1] disclosure may risk circumvention of agency regulation [known as "high 2"], or [2] the material relates to trivial administrative matters of no genuine public interest [known as "low 2"]." Id. (internal quotation marks and citation omitted).

In this case, the Government argues that the material in question is properly withheld under high 2 because its disclosure could risk circumvention of agency regulations. After carefully reviewing the withholdings in camera, the Court agrees. See Caplan v. Bureau of Alcohol, Tobacco & Firearms of Dep't of Treasury, 587 F.2d 544, 547 (2d Cir. 1978) (withholding of internal law enforcement manual proper under exemption 2 because disclosure would "significantly assist those engaged in criminal activity by acquainting them with the intimate details of the strategies employed in [their] detection").

With regard to law enforcement and threat level assessments of Kurnaz, which consist not only of the assessments themselves but of the investigators' and analysts' rationales for arriving at those assessments, disclosure could theoretically reveal internal "guidelines" followed by CITF in evaluating individual detainees,

"and thereby risk circumvention of U.S. law enforcement and counterterrorism efforts. If CITF's assessments were publicly released, persons hostile to the United States would be able to discern the law enforcement and intelligence information that is particularly important to the government in evaluating persons . . . and then take steps to tailor their behavior to thwart the U.S. government's gathering of information pertinent to making those evaluations." Declaration of Colonel Steven M. Lynch dated May 2007 ("Lynch Decl.") ¶ 10.

As to information concerning interrogation methods used with Kurnaz, the Government explains that "[d]isclosure of the techniques CITF interviewers used to interrogate Kurnaz . . . would risk circumvention of U.S. law enforcement efforts in the [Global War on Terror] by permitting persons potentially subject to interrogation to anticipate and counter CITF's techniques so as to avoid providing information to investigators." Lynch Decl. ¶ 18.

Finally, as to investigative procedures used in investigating and assessing Kurnaz, their disclosure "would reveal the internal guidelines CITF follows in conducting law enforcement investigations of Guantanamo detainees and other persons of investigative interest . . . persons hostile to the United States could [then] discern the types of information the government looks for in conducting terrorism-related law enforcement investigations and take steps to counter or thwart the government's effort to obtain such information in the future." Lynch Decl. ¶ 14.

While the Court understands that plaintiff has been put in the very difficult position of objecting to the Government's withholdings without having ever seen the information in dispute, the Court, after reviewing all of the withholdings at issue here, concludes that plaintiff's remaining arguments with regard to Exemption 2 are likewise unavailing.` First, plaintiff argues that the Government is attempting to withhold material "that sets forth and clarifies an agency's substantive and procedural law." <u>See Caplan</u>, 587 F.2d at 548. According to plaintiff "[t]he government does not claim that it is withholding its manual for catching terrorists; rather, it attempts to keep secret the content of the substantive rules and standards governing who should be detained as an enemy combatant or who is subject to conviction and punishment by the U.S. government via military commission." Pl. Mem. at 28. After reviewing the documents actually withheld pursuant to Exemption 2, however, the Court finds that the Government is <u>not</u> attempting to withhold any "manual for catching terrorists" or any substantive rules or standards whatever. Nor is it attempting to withhold "substantive provisions of the U.S. Code." Pl. Mem. at 29 n. 23. Instead, it is withholding information that does not itself lay out any rules or regulations that guide agency action, but, instead, provides particular intelligence and law enforcement assessments and some of the reasoning behind such assessments, revealing how analysts evaluated Kurnaz's statements to various interrogators. Such information, if revealed, could then be used to discern why analysts believed or disbelieved particular aspects of his Kurnaz's story and

14

how they evaluated the truthfulness of the information they received. Further, if terrorist organizations learned that Government interrogators were sympathetic to, or skeptical about, particular assertions, they would then likely train their members to state or withhold this type of information during interrogations.  See Supp. Buzby Decl. ¶¶ 8-10; Supplemental Declaration of Colonel Steven M. Lynch dated July 26, 2007 ("Supp. Lynch Decl.") ¶¶ 7-9.  Therefore, such information is properly withheld pursuant to exemption 2.

Similarly, contrary to plaintiff's supposition that the redacted material in Disputed Doc. 44 is not what the Government claims it to be, in fact, the withheld information does reveal interrogation methods and techniques.  See Pl. Mem. at 30.[5]

Lastly, with regard to plaintiff's argument that the Government's withholdings pursuant to Exemption 2 fail in general because they redact law enforcement techniques already known to the public, the Court need not reach the question of whether such "widely known" techniques can be withheld, see Ferri v. Bell, 645 F.2d 1213, 1224 (3d Cir. 1981), because the withholdings do not in fact redact any such information.  See Pl. Mem. at 31-32.

The Court similarly holds that the Government's withholdings under Exemption 5 are proper.[6]  Exemption 5 protects "inter-agency or

_____

[5] So far as the Court can discern, none of the interrogation methods and techniques here utilized was of the controversial kind that have raised issues in other cases.

[6] The material withheld under exemption 5 that has already been found exempt under exemptions 1 and 2 is not considered here.

intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). This exemption specifically protects the "deliberative process or executive privilege, which protects the decisionmaking processes of the executive branch in order to safeguard the quality and integrity of governmental decisions." Hopkins v. U.S. Dep't of Hous. & Urban Dev., 929 F.2d 81, 84 (2d Cir. 1991) (internal quotation marks and citations omitted). There are two requirements for invocation of the deliberative process privilege. First, "the document must be predecisional, that is, prepared in order to assist an agency decisionmaker in arriving at his decision. Second, the document must be deliberative, that is, actually . . . related to the process by which policies are formulated." Id. (internal quotation marks and citations omitted).

A document is "predecisional" when it is "prepared in order to assist an agency decisionmaker in arriving at his decision." Renegotiation Bd. v. Grumman Aircraft Eng'g Corp., 421 U.S. 168, 184 (1975). This includes recommendations, drafts, and other documents that reflect the opinions of the writer, rather than the policy of the agency. Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 482 (2d Cir. 1999). A document is considered predecisional if the agency can point to the specific decision to which the document relates and verify that the document was created prior to the time that decision was made. Id. Documents prepared by officials who "themselves lack any authority to take final agency action . . . are necessarily predecisional." Hopkins, 929 F.2d at 85. Finally, a document is

deliberative when it is "actually . . . related to the process by which policies are formulated." Grand Cent., 166 F.3d at 482. This requires an inquiry into whether the document was an important part of the agency's "consultative process," whether it reflects the opinions of the author, as opposed to the agency, and whether it might "reflect inaccurately upon or prematurely disclose" the agency's views. Id. at 483.

Even if a document is predecisional and deliberative, it is not entitled to protection under the deliberative process privilege "if the agency has chosen expressly to adopt or incorporate by reference [a] . . . memorandum previously covered by Exemption 5 in what would otherwise be a final opinion. In such a circumstance, the document loses its predecisional and deliberative character, and accordingly, the deliberative process privilege no longer applies." Nat'l Council of La Raza v. Dep't of Justice, 411 F.3d 350, 356 (2d Cir. 2005).

Here, the Government withholds, pursuant to exemption 5, various assessments and recommendations prepared by DOD components and other agencies and provided to: (1) the CSRTs, for their consideration in deciding whether Kurnaz was properly designated an enemy combatant; (2) the ARBs, for their consideration in making recommendations to the DCO regarding whether to transfer, release, or continue to detain Kurnaz; (2) the DCO, for his consideration in making the ultimate decision regarding transfer, release, or further detain; and (3) the Deputy Secretary of Defense, for his consideration, during the pre-ARB review process, in deciding whether

to transfer, release, or detain Kurnaz.[7]  See Hecker Decl. ¶¶ 26-28, 31-36; Buzby Decl. ¶¶ 5-7; Lynch Decl. ¶¶ 20-22.

Plaintiff first argues that the CSRT record is not within the scope of the privilege because it represents the final decision of the Tribunal.  Pl. Mem. at 33.  This is incorrect.[8]  Plaintiff's reliance on Bismullah v. Gates, 501 F.3d 178 (D.C. Cir. 2007) is similarly misplaced.  That case held that, "[i]n order to review a [CSRT's] determination that, based upon a preponderance of the evidence, a detainee is an enemy combatant, the court must have access to all the information available to the Tribunal.  We therefore hold that, contrary to the position of the Government, the record on review consists of all the information a Tribunal is authorized to obtain and consider," not simply the Record of Proceedings compiled by the CSRT Reporter.  Id. at 181.  However, this does not support the proposition that the CSRT Record, or all of

_____

[7] Because the Court finds that the information withheld pursuant to Exemption 5 is proper under the deliberative process privilege, it need not reach the Government's argument that some of these documents are also protected by the attorney-client privilege.

[8] It is also largely irrelevant, as the Government only actually relies solely on Exemption 5 to withhold specific information contained in two of 24 CSRT exhibits: a conclusion by CITF regarding Kurnaz's prosecution potential and a disposition recommendation contained in a CITF assessment memo, Disputed Docs. 67, 78.  See note 8, infra.  Other instances where Exemption 5 is asserted are, in any event, properly withheld pursuant to Exemptions 1 and 2.

the evidence available to the Tribunal, is equivalent to the
Tribunal's final decision itself.[9]

Next, plaintiff argues that the DCO's Action Memo is not
predecisional but is instead the final decision of the DCO, and is
therefore not protected by the deliberative process privilege.  See
Pl. Mem. at 37-38; Disputed Docs 95, 337.  Because the Government
relies on Exemption 5 alone to justify withholding only the two
OARDEC recommendations contained in the Action Memos, the Court here
considers only these two recommendations and not the assessments or
recommendations of other agencies, which have been properly withheld
pursuant to other FOIA exemptions.  See Disputed Docs 95, 337; Vaughn
Index Entry Nos. 22, 40.  Although there is language in Associated
Press v. U.S. Dep't of Defense ("AP II"), that might be construed to
suggest that a DCO Action Memo was not predecisional, that language
was in the context of holding that the DCO's decision to transfer a
detainee was not predecisional, as the Government had argued, but was
rather "a final decision by the decisionmaker himself that DOD will
transfer the detainee if the requisite assurances [from the
transferee country] are obtained."  2006 WL 2707395, at *7 (S.D.N.Y.

---

[9] Plaintiff argues that two exhibits, R 12 and R 19, were
incorporated into the CSRT decision by reference, and were
therefore not subject to the deliberative process privilege.
However, the Government never asserted Exemption 5 as a basis for
withholding information contained in R 12, and explained that
while it originally accidently asserted Exemption 5 to justify
withholding particular information in R 19, it later realized
that Exemption 5 had been asserted in error as to paragraphs 4,
6, and 8 of the document.  See Reply Memorandum of Law in Further
Support of Defendant's Motion for Summary Judgment ("Reply") at
20, Supp. Buzby Decl. ¶ 13.  Therefore, the argument is moot.

Sept. 20, 2006).  The Court in that case had no reason to consider whether an OARDEC recommendation contained in an Action Memo was predecisional because the plaintiff had not challenged that withholding.  In this case, after _in camera_ review, it is clear that only the actual decision of the DCO to transfer, release, or continue to detain constitutes the final decision of the agency, and, therefore, only that decision falls outside the deliberative process privilege.  See Hecker Decl. ¶¶ 10, 26-27; Buzby Decl. ¶¶ 5-7; Lynch Decl. ¶¶ 20-22.  The OARDEC recommendations are predecisional and deliberative and are properly withheld pursuant to Exemption 5.

Plaintiff also argues that all of the agency recommendations contained on the Action Memos, as well as the entire ARB record, are incorporated by reference into the DCO's decision and therefore cannot be redacted under Exemption 5.[10]  However, the DCO merely marks the page with his signature to indicate whether he has decided to transfer, detain, or release the detainee.  See Disputed Doc. 95, 337.  His signature indicating his decision says nothing about how he arrived at the decision or what information he found compelling or persuasive in making his choice, which often is a choice between competing assessments and recommendations from various agencies. None of these assessments and recommendations can therefore be deemed incorporated by reference.  See La Raza, 411 F.3d at 358-59 ("[W]here an agency, having reviewed a subordinate's non-binding

---

[10] As discussed above, this argument is largely irrelevant because most of these withholdings have been properly made pursuant to Exemptions 1 and 2, not just Exemption 5.

recommendation, makes a yes or no determination without providing any reasoning at all, a court may not infer that the agency is relying on the reasoning contained in the subordinate's report.") (internal quotation marks omitted).

This case is not at all similar to the facts in La Raza, on which plaintiff primarily relies. In La Raza, the Second Circuit held that the Department of Justice had incorporated and adopted an Office of Legal Counsel Memorandum ("Memo") into its official policy where the Attorney General publicly stated that the Memo justified the Department's official policy change and stated in a letter that he wanted to "state clearly the policy of the Department," and then immediately referred to the Memo. Further, Department employees publicly relied on the Memo as the one and only source of justification for the Department's new policy and described the Memo's contents in that regard. 411 F.3d at 356-58. Instead, this case much more closely resembles Renegotiation Bd., 421 U.S. at 185-86, in which the Supreme Court held that the Renegotiation Board had not incorporated by reference or adopted two reports it received from subordinate divisions where the Board received the reports to aid its deliberation and then issued a final ruling without giving any substantive reasoning or referring to the reports in any way.

Finally, the Government withholds certain information under Exemption 7(A), which applies to "records or information compiled for law enforcement purposes" that could "reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). To fit within Exemption 7(A), "the government must show that (1) a

law enforcement proceeding is pending or prospective and (2) release of the information could reasonably be expected to cause some articulable harm." Manna v. U.S. Dep't of Justice, 51 F.3d 1158, 1164 (3d Cir. 1995). In terms of requiring a pending or prospective law enforcement proceeding, "it is sufficient that the government's ongoing September 11 terrorism investigation is likely to lead to such proceedings." Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice, 331 F.3d 918, 926 (D.C. Cir. 2003).

Here, the withheld information -- the names of individuals and organizations of ongoing law enforcement interest -- was gathered by CITF for law enforcement purposes, and its disclosure could reasonably be expected to interfere with CITF's ongoing terrorism and war crimes investigations in that the subjects of the Government's interest would likely attempt to conceal their activities from U.S. investigators. Lynch Decl. ¶¶ 3, 25. Therefore, it is properly withheld under exemption 7(A). See, e.g., Boyd v. Criminal Div. of U.S. Dep't of Justice, 475 F.3d 381, 386 (D.C. Cir. 2007).[11]

For all of these reasons, the Government's motion for summary judgment must very largely be granted. However, the motion may not

---

[11] Plaintiff argues that the withholdings are improper because they likely include names disclosed elsewhere in the Government's production, and can therefore not be expected to interfere with law enforcement proceedings. Pl. Mem. 44. However, it is not the existence of the people or organizations, but the Government's continued investigatory interest in them, that could be expected to interfere with enforcement proceedings. Lynch Decl. ¶¶ 24, 25. Therefore, even if the names are, in other contexts (for example, in a statement made by Kurnaz himself), disclosed elsewhere in the Government's production, that would not prevent their withholding here.

be granted in full because the Court, upon its <u>in camera</u> review of the disputed documents, has discovered a few minor instances where disclosure is required.[12]  As discussed above, under the exception for official disclosure, the Government waives the right to withhold information if: (1) "the information requested [is] as specific as the information previously released"; (2) "the information requested [matches] the information previously disclosed"; and (3) "the information requested [was] already . . . made public through an official and documented disclosure." <u>Fitzgibbon</u>, 911 F.2d at 765.  A disclosure is official "when the agency responsible for protecting the information discloses it." <u>Wilson v. McConnell</u>, 501 F. Supp. 2d 545, 559 (S.D.N.Y. 2007) (holding that a Congressional publication of classified CIA information does not bind the CIA).  <u>See also</u> <u>Frugone v. CIA</u>, 169 F.3d 772, 774 (D.C. Cir. 1999) ("[W]e do not deem 'official' a disclosure made by someone other than the agency from which the information is being sought").

In this case, the Court is tentatively of the view that the following information must be disclosed because it was identically

---

[12] The Court also discovered a number of instances of accidental or inadvertent disclosure of material that should have been withheld pursuant to exemption 1.  However, pursuant to Exec. Order No. 13,292 § 1.1(b), 68 Fed. Reg. 15,315 (Mar. 25, 2003), "[c]lassified information shall not be declassified automatically as a result of any unauthorized disclosure of identical or similar information."  Under this provision, "inadvertent disclosure [of classified information] does not declassify it." <u>Al-Haramain Islamic Found., Inc. v. Bush</u>, 451 F. Supp. 2d 1215, 1228 (D. Or. 2006), rev'd on other grounds by 507 F.3d 1190 (9th Cir. 2007).

disclosed elsewhere in the Government's production[13]: (1) the
statements that begin "CITF is" on page 114; (2) the dates listed in
paragraph 4 on pages 451-52; (3) the paragraph beginning
"RECOMMENDATION: Approve" on page 454; (4) the few words redacted
before the sentence "We recommend that these five enemy combatants
remain in Guantanamo because" on page 454; (5) one heading and one
sentence of text in the large redacted block on the top of page 454.
If the Government nevertheless contends that these withholdings are
proper and have not been the subject of official disclosure, it may
submit to the Court, in camera, a written explanation of its position
by June 30, 2008. Otherwise, this information must be disclosed to
plaintiff by that date.

        In all other respects, the Government's motion for summary
judgment is hereby granted.


        SO ORDERED.

                                        _____
                                        JED S. RAKOFF, U.S.D.J.

Dated:  New York, New York
        June 22, 2008


_____

        [13] Because the Court is allowing the Government time to
respond to these various withholdings, see infra, the Court will
not indicate here precisely where in the Government's production
this information has been disclosed (nor will it provide
background information which would so indicate) so as not to
prematurely reveal the contents of the withholdings.  If the
Government requires further information, the Court can provide a
confidential explanation of where this information has been
disclosed.

24